UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIM VASQUEZ,

                              Plaintiff,

        v.                                                    No. 15-CV-9528 (KMK)

POLICE OFFICER ROBERT REILLY;                                 OPINION & ORDER
POLICE OFFICER MICHAEL FELTHAM;
POLICE OFFICER JOHN FREDERICKS;
POLICE OFFICER LT. WEISENBERG,

                              Defendants.

Appearances:

Kim Vasquez
Fishkill, NY
*Pro Se Plaintiff*

John J. Walsh, II, Esq.
Paul E. Svensson, Esq.
Hodges Walsh & Messemer, LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Kim Vasquez ("Plaintiff") brings this Action against Defendants Police

Officer Robert Reilly ("Reilly"), Police Officer Michael Feltham ("Feltham"), Police Officer

John Fredericks ("Fredericks"), and Police Officer Lt. Weisenberg ("Weisenberg") (collectively

"Defendants"), pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights in

connection with a search of his home and his subsequent arrest and prosecution. (*See* Second

Am. Compl. (Dkt. No. 33).) Before the Court is Defendants' Motion for Summary Judgment.

(*See* Mot. for Summ. J. (Dkt. No. 54).) For the reasons to follow, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the documents submitted on behalf of Defendants,

(Dkt. Nos. 54–60), Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1

Statement ("Defs.' 56.1") (Dkt. No. 56)), as well as Plaintiff's deposition, (Letter from Paul E.

Svensson, Esq. to Court ("Svensson Letter") Ex. A ("Pl.'s Dep.") (Dkt. No. 73)), and Plaintiff's

submissions, (*see* Letter from Plaintiff to Court (Nov. 20, 2017) (Dkt. No. 61); Reply Decl. of

Paul E. Svensson ("Svensson Reply Decl.") Ex. A (Letter from Pl. to Court (Apr. 13, 2018))

(Dkt. No. 70); First Respon[s]e To Defendants Motion for Summary Judgment ("Pl.'s Opp'n")

(Dkt. No. 77); Reply to Motion for Summ. J ("Pl.'s Reply") (Dkt. No. 79)), and are recounted "in

the light most favorable to" Plaintiff, the non-movant.[1]  *Wandering Dago, Inc. v. Destito*, 879

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.,* No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.,* 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same).  Here, Defendants filed and served their statement pursuant to Rule 56.1, (Dkt. No. 56), and filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (*see* Decl. of Paul E. Svensson, Esq. in Supp. of Mot. for Summ. J ("Svensson Decl.") Ex. I (Dkt. No. 55)).  Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 Statement.  Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible.  *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal,* No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted).  The facts as described below are

not in dispute, except to the extent indicated.

On June 7, 2014, Plaintiff received a telephone call from an alarm company informing

Plaintiff that "the burglar alarm went off in [Plaintiff's] house," (Pl.'s Dep. 28), from what

Plaintiff later learned was a broken window, (*see id.* at 93).  According to Plaintiff, the

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in defendants' Rule 56.1."); *Cherry v. Byram Hills Cent. Sch. Dist.,* No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (internal quotation marks omitted)); *Pagan v. Corr. Med. Servs.,* No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).  However, where factual assertions in Plaintiff's opposition papers do not contain citations to the record, the Court disregards them.  *See Holtz*, 258 F.3d at 73 (explaining that the Court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the Court's attention); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) ("[M]any of the factual assertions in Plaintiff's opposition papers either do not contain citations to the record, or are not supported by the citations in the record. The Court disregards all such assertions.").  Moreover, to the extent Plaintiff's opposition papers and affidavits contradict his earlier deposition testimony, (Pl.'s Dep.), the Court will also disregard them, *see In re Fosamax Prod. Liab. Litig*., 707 F.3d 189, 193 (2d Cir. 2013) (per curiam) (explaining that "the 'sham issue of fact' doctrine . . . prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").  The Court notes that, although the deposition transcript submitted with Defendants' Motion papers contained only excerpted pages, (Svensson Decl. Ex. H), the Court requested, and Defendants submitted, the full version so the Court could review it when deciding the instant Motion.  (Pl.'s Dep.)

representative from the alarm company asked Plaintiff if he "wanted the police to respond, and [he] said yes." (*Id.* at 29; *see also id.* at 42 ("Q. You gave consent to the alarm company to have the police go into the house[?] A. Yes, to see what was going on with the burglar alarm.").)

The police arrived at Plaintiff's home on 267 Congers Road, New City, New York ("the Congers Road apartment") in response to a burglary alarm call. (*See* Svensson Decl. Ex. J (Aff. of Police Officer Michael Feltham ("Feltham Aff.") ¶ 2.) Upon arrival at the residence to investigate the burglary, Feltham and Police Officer Cunnane ("Cunnane") noted that "one (1) of the doors on the building was open and Officer Cunnane and [Feltham] entered the building to ensure that no intruders were present." (*Id.* at ¶ 3.) While in the Congers Road apartment, Feltham and Cunnane entered the master bedroom, where Feltham "observed pieces of crack cocaine . . . on top of a dresser . . . a scale with a white powder residue on it and a razor blade also containing a white powder residue on top of the same dresser." (*Id.* at ¶ 4.) Afterward, Feltham and Cunnane witnessed a black Honda Civic pull into the driveway, and then back out and drive away. (*Id.* at ¶ 6.) Cunnane pulled the vehicle over and spoke to the driver, who was identified as Jena Vasquez, Plaintiff's wife. (*Id.*)

Plaintiff and Jena Vasquez had been legally married since December 2009, had lived together at various residences up until June 7, 2014, and had two daughters together. (*See* Pl.'s Dep. 15, 19.) Plaintiff and Mrs. Vasquez first lived in Nyack, where "[Plaintiff] had keys, [and] she had keys," and Mrs. Vasquez "could come and go when [Plaintiff] [wasn't] there, and [Plaintiff] could come and go if she wasn't there." (*Id.* at 17.) The arrangement was the same in their next apartment in Spring Valley, (*see id.*), and again in 2014 at the Congers Road apartment, (*see id.* at 20). The Congers Road apartment had a "[l]iving room, kitchen, two [bed]rooms, [and a] basement." (*Id.* at 21.) Plaintiff and Mrs. Vasquez had two separate cars,

had two separate sets of keys to come and go from the apartment as they pleased, and shared a bed and the entire bedroom, as well as a closet—although each of their clothes "were all over the place." (*Id.* at 20–23.)  Mrs. Vasquez slept in the home with Plaintiff the night before the incident, (*see id.* at 32), had "free run of the apartment," "was there more than [Plaintiff was] . . . because [Plaintiff was] working," and there was no "part of the house she was forbidden to go into," (*Id.* at 22–23).

At the time Mrs. Vasquez's car was stopped, her two daughters were in the back seat of the vehicle. (*See* Svensson Decl. Ex. B ("Police Report") 13.)  Cunnane asked why Mrs. Vasquez "pulled into the driveway and expeditiously left[,] and she stated she was worried about what was going on with all of the police vehicles at her residence." (Police Report 20.)  Cunnane asked Mrs. Vasquez to "return back to her home and she obliged." (*Id.*)  Mrs. Vasquez then returned to the Congers Road apartment, with Cunnane following, and confirmed that it was her apartment. (*Id.*)

At some time during these interactions, Mrs. Vasquez got in touch with Plaintiff, informing him that "she was waiting there, and there were police at the house." (Pl.'s Dep. 29.)  After speaking to Mrs. Vasquez, Plaintiff's "assumption was" that the police would "[g]o in the house . . . like do fingerprints or something like that." (*Id.* at 31.)  Plaintiff "was hoping the police would go and help me or see what's going on, investigate the burglary." (*Id.*)  Mrs. Vasquez ultimately provided verbal consent to search, (Police Report 13), and signed a written consent form allowing Feltham and Reilly "to conduct a complete search of the premises and property, including all buildings and vehicles, both inside and outside of the property located at 267 Congers Rd.," (*see* Svensson Decl. Ex. C ("Consent to Search Form")).  Officer Feltham states that Mrs. Vasquez "willingly complied" with the consent request, and "[a]t no time was

she coerced or threatened in any way." (Feltham Aff. ¶ 8.) After receiving Mrs. Vasquez's consent, Feltham, Reilly, and Weisberg proceeded to search Plaintiff's home, specifically the master bedroom, where they found "various narcotics and narcotic packaging." (*Id.* at ¶ 11.) According to the police report, Feltham found the narcotics and narcotics packaging in Mrs. Vasquez's and Plaintiff's shared bedroom, specifically in the "top right dresser draw[er]," and "in the draw[er] directly below the top right dresser draw[er]." (Police Report 13–14.) Reilly entered the bedroom with a K-9, which "began to vigorously scratch on the clothes pile" in the master bedroom. (*Id.* at 18.) Reilly then moved the clothes away, and "observed a white Macy's paper bag." (*Id.*) Reilly checked inside the bag and saw "a large plastic container filled with Marijuana, a large Coffee Mate Creamer container, can of engine degreaser and a can of spray paint." (*Id.*) Reilly inspected these items, which revealed them to be "stash cans with false bottoms." (*Id.*) The Coffee Mate Creamer held Marijuana and Cocaine, the engine degreaser can contained Cocaine, Oxycodone and other assorted pills, and the spray paint can was empty. (*See id.*) Reilly also observed "a cologne box behind the television in the master bedroom." (*Id.*) Reilly opened the box, saw that it contained $5,700, and had Fredericks secure the evidence. Fredericks arrived shortly after the search began, documented the findings at the scene, and transported the assorted narcotics and paraphernalia back to the Clarkstown Police Department. (*See id.* at 14.)

On June 12, 2014, Fredericks prepared and filed a felony complaint accusing Plaintiff of "[c]riminal possession of a controlled substance in the third degree (3 counts)," "[c]riminal possession of a controlled substance in the fifth degree (3 counts)," "[c]riminal possession of marihuana in the second degree," "[c]riminally using drug paraphernalia in the second degree," and "[c]riminal possession of a controlled substance in the seventh degree." (Svensson Decl. Ex.

D ("Felony Complaint").)  An arrest warrant was issued for Plaintiff the next day, (*see id.* Ex. E

("Arrest Warrant")), and Plaintiff ultimately turned himself in to the Clarkstown Police on June

23, 2014, (*see* Defs.' 56.1 ¶ 16; Pl.'s Dep. 85–88).  In addition to the Clarkstown warrant, there

were two other outstanding warrants for Plaintiff's arrest.  (*See* Defs.' 56.1 ¶ 17; Pl.'s Dep. 44–

46.)  Plaintiff spent one night in jail, was released on his own recognizance, and then appeared in

the County Court related to the indictment predating the felony complaint and warrant arising out

of the June 7, 2014 search.  (Pl.'s Dep. 85–88.)

Plaintiff pled guilty to the Rockland County Court indictment in "March or February" of

2015.  (*Id.* at 55; Svensson Reply Decl. Ex. B ("Sentencing Transcript") 8 ("The Court is aware

the defendant plead [sic] guilty on March 4th of [2015].")  The charges "brought against

[Plaintiff] as a result of the search of the house on June 7, 2014 were covered by [his] [guilty]

plea on the indictment."  (Pl.'s Dep. 56.)  The Certificate of Disposition reflects this, stating that

"the charges w[ere] disposed of as indicated—Dismissed and Covered By Rockland County

Court Indictment # 2014–213."  (Svensson Decl. Ex. G ("Certificate of Disposition").)  On June

23, 2015, the County Court made clear that it was disposing of the Clarkstown matter arising out

of the June 7, 2014 search by way of the guilty plea and sentence imposed.  (*See* Sentencing

Transcript 20 ("THE COURT:  Miss Kovacs, my notes indicate there's a matter pending in

Clarkstown which is to be covered by this; is that correct?  MS. KOVACS:  Yes, your Honor.");

*see also* Pl.'s Dep. 56 ("Q.  But for whatever reason the charges that were brought against you as

a result of the search of the house on June 7, 2014 were covered by your plea on the indictment;

yes or no?  A.  That's what it says, but regardless, yes.").)  Plaintiff was sentenced to two years

in prison and one and a half years of post-release supervision.  (*See* Sentencing Transcript 18.)

B. Procedural History

Plaintiff filed his Complaint on December 4, 2015. (*See* Dkt. No. 2.) On January 20, 2016, then-Chief Judge Preska issued an Order to Amend, directing Plaintiff to file an Amended Complaint correcting various deficiencies in his Complaint. (*See* Dkt. No. 5.) On March 7, 2016, Plaintiff sent a letter indicating that he wanted his case transferred to a judge in White Plains. (*See* Letter from Plaintiff to Court (Mar. 7, 2016) (Dkt. No. 7).) On March 18, 2016, in accordance with Judge Preska's prior order, Plaintiff filed his Amended Complaint. (*See* Dkt. No. 8.) The case was reassigned to this Court on March 29, 2016, (*see* Dkt. (Notice of Case Reassignment Mar. 29, 2016)), and on April 7, 2016, the Court issued an Order of Service, which, among other things, dismissed the claims against Jena Vasquez and substituted the Town of Clarkstown as a Defendant in place of the Clarkstown Police Department, (*see* Dkt. No. 10).

On May 3, 2016, the Town of Clarkstown—then, the only remaining Defendant—filed a letter requesting leave to file a motion to dismiss. (*See* Letter from Paul E. Svensson, Esq., to Court (May 3, 2016) (Dkt. No. 15).) The Court granted leave and set a schedule, (*see* Memo Endorsement (Dkt. No. 17)), and on June 13, 2016, the Town of Clarkstown filed its Motion To Dismiss and supporting documents, (*see* Dkt. Nos. 18–22). Plaintiff responded on July 11, 2016, objecting that he had not consented to the substitution of the Town of Clarkstown, arguing that the case should be adjourned because he was unable to litigate the case due to issues he faced at the correctional facility where he was then housed, and requesting that the Court appoint a pro bono attorney for him. (*See* Letter from Plaintiff to Court (July 11, 2016) (Dkt. No. 23).) The Town of Clarkstown filed a reply affirmation in support of its Motion. (*See* Dkt. No. 24.) On August 8, 2016, the Court informed Plaintiff that he needed to be more specific about the relief he sought, but that it was not inclined to grant Plaintiff's requests. (*See* Memo Endorsement

(Dkt. No. 26).) Plaintiff filed another letter on September 24, 2016, requesting leave to file a second amended complaint and asking the Court to issue an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997). (*See* Letter from Plaintiff to Court (Sept. 24, 2016) (Dkt. No. 27).) The Court denied Plaintiff's request because the proposed second amended complaint concerned facts unrelated to the current case. (*See* Memo Endorsement (Dkt. No. 29).) On October 22, 2016, Plaintiff wrote again, explaining that he intended only to add the police officers who were involved in the search and arrest. (*See* Letter from Plaintiff to Court (Oct. 22, 2016) (Dkt. No. 31).) The Court granted Plaintiff two weeks to file the proposed amended complaint. (*See* Memo Endorsement (Dkt. No. 32).)

On November 15, 2016, Plaintiff filed a Second Amended Complaint. (*See* Dkt. No. 33.) Upon application from the Town of Clarkstown, the Court declared the Second Amended Complaint a nullity because it went beyond the parameters set forth by the Court in its order permitting Plaintiff to amend. (*See* Memo Endorsement (Dkt. No. 35).) The Court shortly thereafter revised its determination, holding that the Second Amended Complaint should be accepted for filing and informing Defendants, not including the Town of Clarkstown (which had been removed from the case), that they could supplement the pending Motion To Dismiss. (*See* Order (Dkt. No. 36).) Defendants thereafter supplemented their Motion. (*See* Dkt. Nos. 38–42.) Plaintiff filed a letter responding to the Motion, (*see* Dkt. No. 43), and Defendants filed a reply, (*see* Dkt. Nos. 44–45).

On March 9, 2017, the Court issued an Opinion and Order granting in part and denying in part Defendants' Motion To Dismiss. The Court dismissed Plaintiff's false arrest and First Amendment claims against all Defendants, as well as Plaintiff's supervisory liability claims against Rios, with prejudice. (*See* Opinion & Order 29 (Dkt. No. 46).) Defendants filed an

Answer on May 8, 2017, (*see* Answer (Dkt. No. 47)), and the Parties thereafter conducted discovery.

On October 24, 2017, Defendants filed a letter seeking to file a Motion for Summary Judgment, (*see* Dkt. No. 52), and the Court set a briefing schedule, (*See* Mot. Scheduling Order (Dkt. No. 53)). Defendants filed their Motion and accompanying papers on December 1, 2017. (*See* Dkt. Nos. 54–60.) On December 18, 2017, the Court received a letter from Plaintiff dated November 24, 2017 seeking to amend his Complaint and respond to Defendants' premotion letter. (*See* Dkt. No. 61.) The Court informed Plaintiff that he was "free to seek leave to amend the Complaint, but there currently is a pending summary judgment motion to which Plaintiff <u>must</u> respond by January 5, 2018." (Memo Endorsement (Dkt. No. 65).) On April 12, 2018, in response to a letter filed on April 4, 2018 in an unrelated case, the Court declined to consolidate Plaintiff's cases, noting that the unrelated case was already closed. (*See* Memo Endorsement (Dkt. No. 67).) Defendants' counsel thereafter filed a Reply declaration in support of the pending Motion on April 23, 2018. (*See* Svensson Reply Decl.)

However, the Court also received a letter from Plaintiff dated April 23, 2018, where he claimed that he never received a copy of Defendants' Motion papers. (*See* Letter from Plaintiff to Court (April 23, 2018) (Dkt. No. 72).) On May 2, 2018, Plaintiff filed a letter that purported to oppose Defendants' Motion "without having read it." (Pl.'s Opp'n 2.) Defendants filed a letter confirming that they had properly served Plaintiff with the Motion papers at two Texas mailing addresses previously provided by Plaintiff. (*See* Letter from Paul E. Svensson, Esq. to Court (May 3, 2018) (Dkt. No. 75).) In response to Defendants' letter, the Court ordered Plaintiff to file any documentation contesting service by May 15, 2018. (*See* Order (Dkt. No. 78).) On May 14, 2018, Plaintiff filed what he deemed was his "Reply" to Defendants' Motion,

but did not attempt to contest prior service of the Motion.  (*See* Pl.'s Reply.)  Defendants filed a

Reply declaration in response to Plaintiff's May 14, 2018 Reply submission.  (*See* Defs.' Reply

Decl. in Resp. To Plaintiff's Reply Aff. in Opp'n ("Defs.' Reply Decl. in Resp.") (Dkt. No. 80).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper

Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)

(same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy

Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114,

123 (2d Cir. 2013) (alteration, citation, and internal quotation marks omitted).  Further, "[t]o

survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a

'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with

specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted). However, a district court should consider "only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and

show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344, and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).  And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B.  Analysis

#### 1.  Fourth Amendment Claim

Defendants contend that Plaintiff's Fourth Amendment claim must fail because Plaintiff initially consented to the Clarkstown police investigating the possible burglary at his home and because Plaintiff's wife consented to a search of the premises.  (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 6–8 (Dkt. No. 57).)

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is per se unreasonable under the Fourth Amendment, unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement." *United States v. Turner*, 23 F. Supp. 3d 290, 303 (S.D.N.Y. 2014) (italics omitted); *see also Steagald v. United States*, 451 U.S. 204, 211 (1981) ("Except in . . . special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant."). One exception to the warrant requirement is where "proper consent" is "voluntarily given." *United States v. Matlock*, 415 U.S. 164, 166 (1974). "Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses common authority over the premises." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (citation omitted) (citing *Matlock*, 415 U.S. at 171).

"[A] third party has authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over that area, (b) a substantial interest in the area, or (c) permission to gain access to the area." *Moore v. Andreno*, 505 F.3d 203, 208–09 (2d Cir. 2007); *see also United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009) ("Authority to consent to a search rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (internal quotation marks omitted)). Even if the third party lacks actual authority to consent, he or she "still may have apparent authority to consent to the search." *Moore*, 505 F.3d at 209. The existence of apparent authority "must be judged against an objective standard:

would the facts available to the officer at the moment warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (alteration and internal quotation marks omitted).

The record is ambiguous as to whether Plaintiff actually consented to a search of his home in response to the burglary alarm, or if he simply consented to the police going *to* his home. For example, Plaintiff states that the alarm company called his cell phone and "asked [him] if [he] wanted the police to respond, and [he] said yes," that he "wanted the police to go to the house." (Pl.'s Dep. 29.) However, it was Plaintiff's "*assumption*" that the police would "investigate the burglary . . . [g]o in the house . . . like do fingerprints or something like that." (*Id.* at 31 (emphasis added).) While Plaintiff "was hoping the police would go and help [him] or see what's going on, investigate the burglary," and he may have *assumed* a search would be part and parcel of "investigat[ing] the burglary," (*id.*), the Court cannot say at this stage, particularly given the special solicitude afforded to pro se litigants, that it is undisputed that Plaintiff *actually consented* to a search of his home by the Clarkstown police, nor are there any records, affidavits, or testimony from the alarm company regarding a conversation conveying any such consent to the Clarkstown police.

However, it is undisputed that Mrs. Vasquez consented to the search of the home in which the narcotics and narcotic paraphernalia was located. (*See* Consent to Search Form; Second Am. Compl. ¶ 16.) The record is clear that Mrs. Vasquez had access to the master bedroom where the narcotics and narcotics paraphernalia were found, as Plaintiff testified that he and Mrs. Vasquez shared that room. (*See* Pl.'s Dep. 22 ("Q. . . . So you and [Mrs. Vasquez] stayed in the same room? A. Yes. Q. Stayed in the same bed. A. Yes.").)

With regard to whether Mrs. Vasquez had common authority over that area, a substantial interest in the area, or permission to gain access to the area, the record is unequivocal that she had such authority, interest, and permission. "Common authority is, of course, not to be implied from the mere property interest a third party has in the property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7 (citations omitted). Unsurprisingly, courts routinely find that spouses possess common authority. *See, e.g.*, *United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) ("[A] spouse presumptively has authority to consent to a search of all areas . . . ."); *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988) (finding consent valid where the consenting party, the estranged wife of the defendant, possessed a key to the premises and removed her personal belongings during the search); *Maloney v. Cty. of Nassau*, No. 03-CV-4178, 2010 WL 3940456, at *6 (E.D.N.Y. Sept. 30, 2010), *aff'd*, 500 F. App'x 30 (2d Cir. 2012) (holding that the "plaintiff's wife had actual authority to consent to the search," where he "d[id] not dispute that his wife was the record owner or that she shared occupancy with [the] [p]laintiff"). Plaintiff's own testimony confirms that Mrs. Vasquez had the requisite common authority necessary to consent to the search. As of June 7, 2014, Plaintiff and Mrs. Vasquez had lived together as a married couple, uninterrupted, since 2009. (*See* Pl.'s Dep. 15.) In each residence they shared, including at the Congers Road apartment, Plaintiff and Mrs. Vasquez had separate keys and equally shared all rooms of the home. (*See id.* at 15, 17, 22.) *See also United States v. Wyche*, 307 F. Supp. 2d 453, 458 (E.D.N.Y. 2004) ("[T]he Second Circuit has found a key to the premises to be a factor in the analysis of common authority." (internal quotation marks omitted)). Mrs. Vasquez slept in the bedroom with Plaintiff, "ke[pt] her clothes . . . all over the place [in the room]," and generally had "free run of the apartment," including their shared master bedroom

that was the subject of the search at issue here. (Pl.'s Dep. 22.) "Under the law of th[e] [Second] Circuit," evidence that Mrs. Vasquez had "permission to access [the] room, and . . . actually entered it a number of times . . . is sufficient to show that [Mrs. Vasquez] had actual authority to consent to the search of [the] bedroom." *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004). Accordingly, Plaintiff's wife had actual authority to consent to the search of their shared home, and specifically had actual authority to consent to a search of the master bedroom.[2]

However, even though Plaintiff's wife had actual authority to consent to the search in question, there is still a question as to whether that consent was voluntary under the circumstances. "Voluntariness is determined by reference to the totality of all the circumstances . . . [w]hile more than mere acquiescence in a show of authority is necessary to establish the voluntariness of a consent, the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (citations and internal quotation marks omitted). "Various factors can contribute to a finding that law enforcement created coercive surroundings. For example, 'it

---

[2] The Second Circuit has explained that, "when considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in *the object* apart from his expectation of privacy in the home." *United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002). However, there is nothing in the record to indicate that Mrs. Vasquez lacked actual authority to consent to the search of the items *within* the master bedroom—i.e., the dresser, the Macy's bag or its contents under the pile of clothing, or the box near the television. To the contrary, Plaintiff testified that he and Mrs. Vasquez shared the entire bedroom that was the subject of the search, as well as a closet—although each of their clothes "were all over the place." (Pl.'s Dep. 20–23.) Plaintiff also noted that Mrs. Vasquez was in charge of the laundry of the clothes that were on the floor and "all over the place," that she had "free run of the apartment," and there was no "part of the house she was forbidden to go into." (*Id.* at 22–23.) Accordingly, while "[a]n adult's dresser drawer is generally recognized as a place where a person can place private items and can expect them to remain private," *United States v. Chisholm*, No. 07-CR-795, 2009 WL 29313, at *8 (E.D.N.Y. Jan. 5, 2009) (citing *Georgia v. Randolph*, 547 U.S. 103, 112 (2006)), the record is clear that the searched items were not just Plaintiff's, but rather shared items within Plaintiff's and Mrs. Vasquez's bedroom, (*see* Pl.'s Dep. 15–23).

is significant if consent has been obtained while the consenting party was confronted by many police officers. . . . Additionally, an attempt by law enforcement to enter a home at an unusually late or early hour may contribute to a finding of coercion. Likewise, coercion may be present if law enforcement agents persist in attempting to gain entry in the face of a suspect's refusal to consent." *United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, N.Y.*, 775 F. Supp. 2d 545, 556 (E.D.N.Y. 2011) (citations and alterations omitted) (quoting 4 Wayne R. LaFave, *Search and Seizure* § 8.2(b) (4th ed. 2004)); *see also United States v. Echvarria*, 692 F. Supp. 2d 322, 336–37 (S.D.N.Y. 2010) ("Some of the factors that bear upon the voluntariness of the consent include 'whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent . . . .'" (internal quotation marks omitted). "The factual inquiry concerning the voluntariness of consent is guided by an objective standard," meaning "whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Sylla*, No. 08-CR-906, 2010 WL 582575, at *7 (E.D.N.Y. Feb. 16, 2010) (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)).

Here, at or around 9:15 p.m., officers "pursued" Plaintiff's wife's vehicle, "made a car stop," and "followed her back to her house." (Police Report 20; Consent to Search Form.) Defendants contend that "she willingly complied" with the request for a consent to search, and "[a]t no time was she coerced or threatened in any way." (Feltham Aff. ¶ 8.) Indeed, that Mrs. Vasquez was pulled over, and by implication in custody at the time she consented to the search, is not dispositive, as "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976);

*see also United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) (determining that the mere fact that the defendant was "under arrest and in custody, or even handcuffed" does not necessitate finding that consent to search was coerced as a matter of law). Plaintiff testified that "they was [sic] just interrogating [his] wife to get a consent to go in the house," (Pl.'s Dep. 95), but Plaintiff was not present for any conversations between Mrs. Vasquez and the police. Moreover, Plaintiff also has testified that when he spoke to Mrs. Vasquez, she simply "let [him] know that she was waiting [at the apartment], and there were police at the house," (Pl.'s Dep. 29), and "[t]hat was pretty much what the conversation was about," (*id.* at 30). Plaintiff has offered no first-hand evidence to indicate that any of the officers intimated, threatened, deceived, made promises or exhibited more subtle forms of coercion in order to procure Mrs. Vasquez's consent. Plaintiff's wife has not submitted an affidavit attesting to any coercion on the part of the police, nor has Plaintiff submitted any admissible evidence from her to that effect. Accordingly, the Court finds that there is simply no basis to find that Mrs. Vasquez's consent to search his residence was not in fact freely and voluntarily given. *See Snype*, 441 F.3d at 131–32 (holding that an apartment owner's consent to search was voluntary despite the fact that "a heavily armed SWAT team . . . initially secured her and her boyfriend in handcuffs and raised the possibility of taking the couple into custody while placing [the owner's] young daughter in protective care"); *United States v. Ansaldi,* 372 F.3d 118, 129 (2d Cir. 2004) (upholding a finding of voluntary consent to a search even though, prior to his consent, the defendant was arrested by five or six officers who had previously pulled out their guns to effectuate the arrest and placed the defendant in handcuffs); *United States v. Kon Yu–Leung*, 51 F.3d 1116, 1118–19 (2d Cir. 1995) (upholding a finding of voluntary consent provided by a defendant when six officers entered his home in the early morning hours, handcuffed him, and assured him that if the

defendant refused to consent to a search the officers would remain there until a warrant was obtained); *United States v. Arango–Correa*, 851 F.2d 54, 57–58 (2d Cir. 1988) (upholding a finding of voluntary consent where the defendant was held for five hours, strip-searched, and questioned before providing consent); *United States v. Ceballos*, 812 F.2d 42, 46, 51 (2d Cir. 1987) (upholding a finding of voluntary consent where the defendant was been forcibly arrested, questioned for several hours, and threatened with destruction of his home if he did not cooperate). Thus, the Court grants Defendants' Motion for Summary Judgment as to the claims relating to the search of the Congers Road apartment.

### 2. Malicious Prosecution Claim

Defendants also seek summary judgment on Plaintiff's malicious prosecution claim, arguing that Plaintiff is unable to establish a favorable termination sufficient to state a claim. (*See* Defs.' Mem. 10–12.)

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). To prevail on a malicious prosecution claim under New York law, the plaintiff must show: "(1) the defendant initiated a prosecution against [the] plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in [the] plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (alterations and internal quotation marks omitted). "[A] grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution in relation to the crimes described in the indictment thereby is defeated." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). To transform a state law claim

for malicious prosecution into a § 1983 claim, the plaintiff must allege "some deprivation of liberty consistent with the concept of 'seizure.'" *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995).

It is undisputed that Fredericks initiated a prosecution against Plaintiff, (*see* Felony Complaint), but the record indicates that the prosecution did not terminate in Plaintiff's favor. Favorable termination requires a plaintiff to "demonstrate a final termination of the criminal proceeding in his favor, or at least not inconsistent with his innocence." *Harris v. City of New York*, No. 15-CV-6467, 2017 WL 59081, at *3 (E.D.N.Y. Jan. 4, 2017) (alterations and internal quotation marks omitted). However, "[a] termination is not favorable to the accused if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused. Indeed, it is hornbook law that where charges are withdrawn or the prosecution is terminated by reason of a compromise into which the accused has entered voluntarily, there is no sufficient termination in favor of the accused." *Poventud v. City of New York*, 750 F.3d 121, 131 (2d Cir. 2014) (alterations and internal quotation marks omitted). Thus, New York law is clear that "a guilty plea is not a termination in favor of the accused for purposes of a malicious prosecution claim." *Rivera v. City of Yonkers*, 470 F. Supp. 2d 402, 408 (S.D.N.Y. 2007) (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d Cir. 1999)); *see also Rothstein v. Carriere*, 373 F.3d 275, 286–87 (2d Cir. 2004*)* ("A termination is not favorable to the accused . . . if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused."). Moreover, "if a charge is 'covered' under a separate indictment, a guilty plea as to that indictment is tantamount to a guilty plea as to the charging indictment." *Fate v. Charles*, 24 F. Supp. 3d 337, 342 n.3 (S.D.N.Y. 2014).

On or about March 4, 2015, Plaintiff pled guilty to an indictment in Rockland County Court. (Pl.'s Dep. 55; Sentencing Transcript 8.) At the sentencing stemming from that guilty plea, the court made clear that Plaintiff's guilty plea was not limited to that Rockland County indictment, and that the plea and sentencing would also cover the Clarkstown charges stemming from the search on June 7, 2014. (*See* Sentencing Transcript 20. ("THE COURT: Miss Kovacs, my notes indicate there's a matter pending in Clarkstown which is to be covered by this; is that correct? MS. KOVACS: Yes, your Honor."); Pl.'s Dep. 56 ("Q. But for whatever reason the charges that were brought against you as a result of the search of the house on June 7, 2014 were covered by your plea on the indictment; yes or no? A. That's what it says, but regardless, yes.").) Plaintiff has confirmed that his understanding of the plea agreement was that "the charges that were brought against [him] as a result of the search of the house on June 7, 2014 were covered by [his] plea on the [Rockland County] indictment." (Pl.'s Dep. 56.) The Certificate of Disposition ratifies this arrangement as well, stating that "the charges w[ere] disposed of as indicated—Dismissed and Covered By Rockland County Court Indictment # 2014–213"—the indictment that was also subject to the plea and sentence. (Certificate of Disposition.) Thus, the transcript and record are clear that Plaintiff's guilty plea and sentence in the Rockland County Court were intended to dispose of the Clarkstown charges as well. Therefore, Plaintiff's plea arrangement necessitates "foreclos[ure] [of] the possibility that the termination was favorable." *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 621 (S.D.N.Y. 1999), *abrogated on other grounds by Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999); *see also Wims v. New York City Police Dep't*, No. 10-CV-6128, 2011 WL 2946369, at *3 (S.D.N.Y. July 20, 2011) ("[The] plaintiff's guilty plea for [one charge] in satisfaction of

all charges is not a favorable termination on the charge dismissed as part of the plea deal.").

Accordingly, Defendants' Motion is granted as to the malicious prosecution claim.

## III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. The

Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 54), enter

judgment for Defendants, close this case, and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:    June 7, 2018
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

23